E-FILED
Monday, 24 August, 2015  03:00:35 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| MICHAEL S. CARLOS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No.   14-cv-1263 |
| | ) | |
| TARRY WILLIAMS, *Warden,* | ) | |
| | ) | |
| Respondent. | ) | |

# O R D E R  &  O P I N I O N

This matter is before the Court on Respondent's Motion to Dismiss Petitioner's Petition as Time-Barred. (Doc. 21). For the reasons discussed below, Respondent's motion is granted and the Petition (Doc. 10) is dismissed.

## BACKGROUND

Petitioner Michael Carlos filed his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on May 16, 2014, twenty years after a jury convicted him of first degree murder for shooting and killing Terry Williams and Jerome McDonald. (Doc. 10). He is currently in the custody of Tarry Williams, warden of Stateville Correctional Center in Joliet, Illinois, where he is serving a sentence of natural life imprisonment.

In the Petition, Carlos raises four grounds for relief: the first three are related – he asserts that he is actually innocent of the murder of Williams and McDonald, and should therefore be released from prison. (*See* Doc. 10 at 25-55). In an Order and Opinion entered on September 24, 2013, the Court dismissed these

three grounds as non-cognizable. (*See* Doc. 17 at 6-8). Plaintiff's fourth ground for relief is that the state trial court violated his constitutional rights by improperly admitting prior inconsistent statements of one witness, which he argues impermissibly tainted his trial. (*Id.* at 56-66).   This is the claim that Respondent argues is time-barred by 28 U.S.C. § 2244(d).

Petitioner first filed a direct appeal to his conviction in which he asserted that he was entitled to a new trial on the basis of an erroneous evidentiary ruling made by the trial court. *See People v. Carlos*, 655 N.E.2d 1182 (Ill. App. Ct. 1995). The state appellate court affirmed his conviction and sentence. *Id.* at 1184. At that time, Petitioner elected not to file a petition for leave to appeal in the Illinois Supreme Court. Shortly before filing this pending Petition, Petitioner filed a motion for leave to file a late petition for leave to appeal with the Illinois Supreme Court. (Ex. B to Resp.'s Mot. To Dismiss, Doc. 21-15, at 1-35). The Illinois Supreme Court denied this motion on May 29, 2014. (Ex. C, Doc. 21-15, at 36).

Petitioner filed a petition for relief from judgment under 735 Ill. Comp. Stat. 5/2-1401, on October 31, 2002. (Ex. D, Doc. 21-15, at 37-60). The trial court denied Plaintiff's petition, and the Illinois Supreme Court denied Petitioner's petition for leave to appeal on September 29, 2005 and issued a mandate on October 21, 2005. (Ex. E, Doc. 21-15, at 61).

Five years later, on September 20, 2007, Petitioner filed a state post-conviction petition. (Ex. F, Doc. 21-15, at 62-77). He amended the petition in June of 2009, and added a claim that he was actually innocent of the murders. (Ex. G, Doc. 21-15, at 78-101).  He supported this with the Affidavit of Tylon Rodgers (*id.* at 85-

86) and the Affidavit of Darrin Thornton. (*Id.* at 101). The trial court held an evidentiary hearing and denied Plaintiff's Petition. *See People v. Carlos*, 2013 IL App (4th) 110389-U (Jan. 25, 2013). The Illinois Appellate Court affirmed, *see id.*, and the Illinois Supreme Court denied Petitioner's petition for leave to appeal on May 29, 2013. (Ex. I, Doc. 21-15, at 125).

Finally, Petitioner filed a motion for ballistics testing pursuant to 725 Ill. Comp. Stat. 5/116-3 in September of 2011. (Ex. J, Doc. 21-15, at 126-134). The trial court denied the motion, the Illinois Appellate Court affirmed. *See People v. Carlos*, 2013 IL App (4th) 120450-U. That brings us to Petitioner's current effort to obtain post-conviction relief.

## DISCUSSION

Respondent has not addressed the merits of Petitioner's remaining claim for habeas relief, but has instead moved to dismiss the Petition as untimely. He argues that Petitioner did not file the Petition within the statute of limitations imposed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), and further argues that Petitioner has not presented a claim of actual innocence that would excuse him from his failure to timely file his claims.[1]

---

[1] As an initial matter, Petitioner suggests that Respondent should be sanctioned for deliberately ignoring an Order of this Court. (Doc. 23 at 1-2). Petitioner argues that the Court ordered Respondent to "address the merits" of his "remaining non-dismissed claim," and Respondent ignored that order by filing a motion to dismiss. (*Id.* at 2). The Court acknowledges that its earlier Order was ambiguous. Specifically, it ordered Respondent to file an "answer, motion, or other responsive pleading," but also directed Respondent to file an answer that complies with Rule 5 of the Rules Governing Section 2254 Case in the United States District Courts. (*See* Doc. 17 at 11). Rather than filing an Answer, Respondent elected to file a Motion to Dismiss. This is consistent with the first part of the Court's Order, but it is inconsistent with the second part of the Court's Order. The Court has the discretion

## I.  Timeliness of Petition

AEDPA imposes a one-year statute of limitations in which state court prisoners may bring habeas corpus petitions. *See* 28 U.S.C. § 2244(d). Under the statute of limitations imposed by AEDPA, this petition is untimely.

AEDPA provides that the statute of limitations begins running from the latest of four potential moments: "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;" *id.* at § 2244(d)(1)(A); "the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;" *id.* at § 2244(d)(1)(B); "the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review;" *id.* at § 2244(d)(1)(C); or "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." *Id.* at § 2244(d)(1)(D).

Petitioner acknowledges that his Petition is untimely under 28 U.S.C. § 2244(d)(1)(A), as he must. (*See* Doc. 23 at 10). The Illinois Appellate Court affirmed his conviction on September 21, 1995. *See People v. Carlos*, 655 N.E.2d 1182 (Ill. App. Ct. 1995).  At that time, under Illinois Supreme Court Rule 315(b), he had

---

to either permit Respondent to file a Motion to Dismiss or require Respondent to file an answer pursuant to Rule 5. *See Sperow v. Walls*, 182 F. Supp. 2d 695, 698 (C.D. Ill. 2002). Rather than sanction Respondent, as Petitioner requests, the Court acknowledges the ambiguity in its earlier Order and entertains the pending Motion to Dismiss.

twenty-one days to file a timely petition for leave to appeal, which he failed to do. *See* Ill. Sup. Ct. R. 315(b) (West 1994).[2] Because the statute runs from the expiration of time for seeking such review, Petitioner's conviction was final on October 12, 1995. *See* 28 U.S.C. § 2244(d)(1)(A). AEDPA was enacted on April 24, 1996. For those state court prisoners like Petitioner whose convictions became final prior to AEDPA's enactment, courts provided a one-year grace period – until April 24, 1997 – in which they could timely file habeas petitions. *See Newell v. Hanks*, 283 F.3d 827, 832-33 (7th Cir. 2002).[3] Under § 2244(d)(1)(A), this Petition is nearly seventeen years too late. Further, Petitioner has not suggested that the State created an impediment to him filing his Petition, *id.* at § 2244(d)(1)(B), nor has he alleged a claim based on a newly recognized constitutional right. *See id.* at § 2244(d)(1)(C).

Petitioner makes two arguments for why the Court should consider his petition timely, but both are without merit.

First, he argues that his petition is timely pursuant to § 2244(d)(1)(D) because it is "predicated on new evidence which would not have been discovered more than a year prior to his filing." (Doc. 23 at 10). However, the new evidence that

---

[2] The Illinois Supreme Court Rule that was current at that time provided larger amounts of time to petition for leave to appeal for circumstances that are not relevant here. *See* Ill. Sup. Ct. R. 315(b) (West 1994).

[3] Under 28 U.S.C. § 2244(d)(2), AEDPA's statute of limitations is tolled during the time in which a Petitioner is seeking collateral review in State court. Petitioner filed his earliest request for collateral review in State Court in 2002. (*See* (Ex. D, Doc. 21-15, at 37-60). Because he did not have an application for collateral review pending between when his judgment became final (October 12, 1995) and the expiration of AEDPA's grace period (April 24, 1997), his subsequent applications for state court collateral review had no tolling effect. *See Graham v. Borgen*, 483 F.3d 475, 483 (7th Cir. 2007).

Petitioner argues he has uncovered relates to his claim of actual innocence, (*see id.*), and does not relate to his underlying claim – that the trial court violated his due process rights by allowing the State to present evidence of a prior inconsistent statement made by one of its witnesses. (*See* Doc. 10 at 56-66). Petitioner was well-aware of the factual predicate of this claim very early on. Indeed, it was the lone subject of his direct appeal. *See People v. Carlos*, 655 N.E.2d 1182 (Ill. App. Ct. 1995).

Petitioner's later discovery of eyewitnesses who did not testify at his trial has no bearing on this claim. As the Court has previously concluded, Petitioner's stand-alone claims of actual innocence are not cognizable in a habeas corpus petition. (*See* Doc. 17 at 6-8). Petitioner's actual innocence claim instead serves as a gateway that, if successful, would allow the Court to consider Petitioner's otherwise time-barred claim. *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). Because Petitioner has been aware of the factual predicate underlying his single cognizable claim for habeas corpus relief since the time of his trial, the statute of limitations in 28 U.S.C. § 2244(d)(1)(D) provides him with no assistance. *Cf. Escamilla v. Jungwirth*, 426 F.3d 868, 871 (7th Cir. 2005), *abrogated on other grounds by McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013)("As a matter of law, new evidence supporting a claim actually made at or before trial cannot form the basis of a new period under § 2244(d)(1)(D).").

Petitioner next argues that he is entitled to equitable tolling of the statute of limitations. In *Holland v. Florida*, 560 U.S. 631 (2010), the Supreme Court held that AEDPA's statutory limitations are subject to equitable tolling in appropriate

cases. *Id.* at 645. In order to invoke the doctrine of equitable tolling, a Petitioner must show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id.* at 649 (internal quotation marks omitted). Petitioner argues that his "compelling claim of actual-innocence" should qualify him for such relief. (Doc. 23 at 10-12).

Petitioner's claim of actual innocence is incompatible with the theoretical framework of the doctrine of equitable tolling. *See Lee v. Lampert*, 653 F.3d 929, 932 n. 5 (9th Cir. 2011). "Although it may rightly be considered an extraordinary circumstance, it cannot be said that a prisoner's actual innocence *prevents* him from timely filing." *Rivas v. Fischer*, 687 F.3d 514, 547, n. 42 (2d Cir. 2012). Indeed, Petitioner was free to pursue his underlying claim in a timely fashion, but for reasons unbeknownst to the Court he chose not to do so. Once he identified what he believes to be compelling evidence of actual innocence, he sought to resurrect a claim that would otherwise have been time-barred by § 2244(d). As explained more fully below, Petitioner is not seeking an equitable extension of the statute of limitations – which is what equitable tolling allows. Rather, he is seeking an equitable exception to the statute of limitations. *See id.* This is permitted in certain rare circumstances, but it must be evaluated under a different theoretical framework than that of equitable tolling.

## II. Actual Innocence Exception to § 2244's Statute of Limitations

Finally, Petitioner argues that he is actually innocent of his crimes, and asserts that he can overcome the hurdle presented by the statute of limitations for this reason. In *McQuiggin v. Perkins*, the Supreme Court held that a showing of

actual innocence provides an equitable exception to AEDPA's statute of limitations. 133 S. Ct. at 1928. It has described actual innocence as a gateway. *Id.* In instances where barriers such as a procedural default or an expired limitations period prevent a petitioner from presenting a cognizable Constitutional claim, a tenable claim of actual innocence will allow the Court to overcome the barrier to hear the underlying claim. *See id.*

The Supreme Court has cautioned that such claims of actual innocence are rare. *Id.* "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995). This standard is "demanding and permits review only in the extraordinary case." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). Gateway claims require "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id.* at 537 (quoting *Schlup*, 513 U.S. at 324). The habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" *Schlup*, 513 U.S. at 328 (internal quotation marks omitted). This determination is "a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 329. Thus, rather than making "an independent

factual determination about what likely occurred," the Court's job is "to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538.

At this juncture, it makes sense for the Court to review the State's case against Petitioner and Petitioner's evidence of actual innocence.

## A. The Case Against Carlos

For a summary of the State's evidence against Petitioner at his trial, the Court turns to the Illinois Appellate Court's decision affirming the denial of Petitioner's post-conviction petition. *See People v. Carlos*, 2013 IL App (4th) 110389-U. The Court presumes that these factual findings are correct. *See* 28 U.S.C. § 2254(e)(1); *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010)(applying the presumption of factual correctness from § 2254(e)(1) to federal actual innocence claims when the issue of actual innocence was adjudicated in state court); *see also*, *Smith v. Harrington*, No. 13-CV-2068, 2014 WL 3704815, at *1 (July 25, 2014).

Terry Williams and Jerome McDonald were shot and killed in the parking lot of the Third Ward Club ("the Club") in Bloomington, Illinois on the evening of December 19, 1992. *See People v. Carlos*, 655 N.E.2d 1182 (Ill. App. Ct. 1995). No physical evidence tied Petitioner to the murders; instead, the State relied upon the eyewitness testimony of multiple individuals who were present at the Third Ward Club at the time of the murder.  Most of the witnesses were friends or relatives of Petitioner and the victims.

The first relevant witness the State presented was Patricia Skinner, who testified that she witnessed Petitioner shoot Williams. *People v. Carlos*, 2013 IL App (4th) 110389-U, at ¶¶ 6-8. Skinner was McDonald's ex-girlfriend, and at that time

9

she was "beginning to have a relationship" with Petitioner. *Id.* at ¶ 6. She testified that she went to the Club with two women, Sandra Johnson and Jackie Samuels. *Id.* at ¶ 7. When they arrived inside the club, Jackie Samuels began loudly arguing with a woman named Shelly Pilant, who was McDonald's girlfriend. *Id.* McDonald stepped in between Pilant and Jackie with a pool cue. After Jackie picked up a cue, the bartender told them to leave. Skinner testified that "[m]ore or less [,] the whole bar came outside" at the time. *Id.*

Skinner testified that once they were in the parking lot, Jackie got into an argument with both McDonald and Williams. *Id.* at ¶ 8. Petitioner – who is Jackie's cousin – then got involved, telling McDonald to leave Jackie alone. At that time, Skinner testified that she was standing next to Williams, and saw Petitioner pull out his gun. *Id.* She testified that she told Petitioner (who was standing between 10 and 15 feet away from her) to put down his gun, but Petitioner fired the gun and Williams fell. *Id.* She fell along with Williams, and saw McDonald already lying on the ground. *Id.*

The next relevant witness was Kirchell Butcher, who testified that she was McDonald's sister, Williams's girlfriend, and Petitioner's cousin. *Id.* at ¶ 9. She also testified that she saw Petitioner shoot Williams. *Id.* She arrived at the Club with Williams in order to pick up McDonald and Pilant. *Id.* She testified that as they arrived, Jackie and Williams began arguing, and Jackie kicked the car. Williams began walking toward the Club while she stayed in the car. She testified that Williams and Petitioner began arguing when Williams was on his way to the Club. *Id.* At that point, she saw Petitioner "turn to his side, pull a black gun from his

10

waist, and point the gun at Williams." *Id*. She heard the shot, and immediately ran to the aid of Williams. *Id*. Although she saw McDonald on the ground, she did not see him get shot. *Id*. Unlike others who testified, Kirchell testified that the parking lot was relatively empty – she said she only saw seven other people in it at the time of the shooting. *Id*. at ¶ 10. She also gave fluctuating estimates as to how far Petitioner and Williams were from her when she saw him shoot Williams. *See id*.

The State also presented Thomas Ahlers as a witness. *Id*. at ¶¶ 11-13. Ahlers testified that he saw Petitioner shoot McDonald. *Id*. at 12. He saw Williams and McDonald exit the club together, and saw McDonald argue with Jackie, who was with Petitioner. *Id*.  He saw Petitioner "walk away," return with a gun in his hand, and shoot "toward McDonald." *Id*.  When Petitioner turned toward Ahlers, Ahlers jumped behind a van and then heard another shot. He then saw another person grab his chest. *Id*. At the time of his testimony, Ahlers had pleaded guilty to a drug crime and had prior convictions. *Id*. at ¶ 13. The State offered Ahlers a five-year prison term in exchange for his truthful testimony at Petitioner's trial, which made Ahlers feel "kind of uncomfortable," because he and Petitioner were in the same gang. *Id*.

The State also offered the testimony of Jackie Samuels, who wanted to go to the Club to speak with Pilant about things that she had said about her son. *Id*. at ¶ 14. .). She did not see a gun, and did not see Petitioner shoot anybody. *Id*. at ¶ 17. She also did not hear shots, and said there was "loud music out in that parking lot." *Id*. This testimony is contrary to what she told police, as she told them that she both heard a shot and saw Petitioner with his arm pointed at McDonald. *Id*.

Jackie testified that she went to the club with Skinner and Petitioner, where she confronted Pilant *Id.* at ¶ 15. After McDonald stepped between her and Pilant, the bartender told them to take it outside. *Id.* Once they went out, there were "a lot of people" in the parking lot. *Id.* When Williams and McDonald exited the club, Jackie testified that she met him "in the middle of the parking lot." *Id.* at 16. Although she testified that she and McDonald were talking calmly, she said that Petitioner stepped in between them and told McDonald to back off. *Id.* Petitioner and Skinner then walked away, behind her. At that point, she "heard Kirchell crying and . . .looked down and seen [Williams] on the ground." *Id.* She then saw McDonald walk away and then fall. *Id.* When she turned, she "either saw [Petitioner] with his arm out and Skinner hit [Petitioner's] arm or heard Skinner say 'she had hit his arm.'" *Id.*

Next, Clyde Butcher testified. *Id.* at ¶¶ 18-19. Butcher is McDonald's stepbrother, Kirchell Butcher's brother, and Petitioner's cousin. *Id.* at ¶ 18. He testified that he went to the Club with McDonald, Pilant, and another man. *Id.* After playing a game of pool, he returned to the van in which he arrived to drink beer. *Id.* He testified that there were a lot of people in the parking lot, including Kirchell Butler, Pilant, Jackie, and Skinner. *Id.* at ¶ 19. He said that while he was in the van, he saw McDonald leave the club and begin to have a conversation with Jackie and Skinner in the parking lot. *Id.* ¶ 18. After cursing, McDonald began to walk away. *Id.* Next, Clyde testified that he saw Petitioner walking toward the Club. When Petitioner was near the van Clyde was in, he started shooting. *Id.* Although Clyde initially testified that he did not see the gun, he later claimed that

he saw a gun but could not describe it. *Id.* He said he saw Petitioner reach with his right hand to his left side and pull out a gun, point the gun, and shoot. *Id.* He testified that McDonald tried to get away from the shots by running toward the van, and Petitioner then turned toward the van and shot. *Id.* Ultimately he heard five gunshots. *Id.*

Shelly Pilant testified that she was McDonald's girlfriend. *Id.* at ¶ 20. She says that she remained inside the club following her argument with Skinner and Jackie. *Id.* She exited the club when Kirchell Butler entered it screaming after the shooting. *Id.* When she exited, she saw Petitioner get into a car, which drove away. *Id.*

Clinton Fullilove spent most of his time at the Club that evening in the parking lot, with Ahlers and a woman. *Id.* at ¶ 21. He went into the Club "[a] couple of times and got a beer," but each time returned to his car. *Id.* He testified that while he was in the parking lot, he saw two people get shot by a man who was around five feet from his car. *Id.* at ¶ 22. He said he did not know the shooter, and said he could not identify the shooter in the courtroom. *Id.*

Marion Carr then testified. *Id.* at ¶¶ 23-26. Carr is the cousin of both Petitioner and McDonald. *Id.* at ¶ 23. Carr said that upon arriving at the Club, he spoke with Petitioner before Petitioner went inside. *Id.* Carr remained in his vehicle, and drank with Tylon Rodgers and a woman. *Id.* He said that he saw Jackie and Skinner in the parking lot, and saw Jackie and McDonald's argument. *Id.* When he heard a shot, said he ran to his car and left the Club. *Id.* Carr steadfastly denied seeing anybody with a gun and seeing anybody shoot anybody else. *Id.*

The State impeached Carr's testimony by asking him about statements he had made to "Spanky" Ledbetter, who taped a conversation he had with Carr.[4] *Id.* at ¶ 24. Ledbetter was a paid police informant. *Id.* During that conversation, Carr told Ledbetter that he saw Petitioner shoot both victims, and also told Ledbetter that Petitioner had said before the shootings that he was going to "take care of business with" McDonald. *Id.* During the trial, Carr stood by his trial testimony and said that he had lied to Ledbetter. *Id.* at ¶ 26. Over Petitioner's objection, the trial court permitted the State to show a recording of Carr's conversation with Ledbetter, which the Illinois Appellate Court, on direct review, summarized as follows:

> The videotape shows Carr talking with Ledbetter in the basement of a house. Carr describes the shooting in detail. Carr explains McDonald was in an argument with a girl named Jackie. Apparently, defendant decided to forcefully intervene. Carr tried to dissuade defendant from using a gun by telling him a gun was not necessary. He also told defendant not to shoot their cousin. However, defendant said he had some business to take care of and shot McDonald. Defendant then turned and shot Williams. Throughout his narration, Carr consistently used the first person singular. At no point did he say the events he was describing were told to him by someone else. At one point, he even disputes a description of the event given to Ledbetter by another eyewitness, telling Ledbetter his version was correct because he was there and he saw the shooting happen.

*People v. Carlos*, 655 N.E.2d 1182, 1183 (Ill. App. Ct. 1995).

Finally, the State presented the testimony of Sandra Garza and a number of police officers. *People v. Carlos*, 2013 IL App (4th) 110389-U, at ¶¶ 27-28. Garza testified to the events surrounding the Petitioner's arrest at an apartment, in which the police entered a bedroom at 3 a.m. on December 20, 1992 from which they escorted Petitioner. *Id.* at ¶ 27. The police interviewed Petitioner at 7 a.m. on

---

[4] Petitioner's remaining claim in this petition relates to the trial court's evidentiary decisions regarding the State's impeachment of Carr.

December 20, 1992. *Id.* at ¶ 28. After police provided Petitioner with his *Miranda* warnings, Petitioner agreed to talk with them without an attorney. *Id.* The police told him that two people had been killed in a shooting, and that several witnesses identified him. *Id.* Police officers testified that upon hearing that, Petitioner "just smiled." *Id.* He told police he was not at the Club, and instead told them he was "in an apartment with a girl." *Id.*

### B. Carlos's Defense & New Evidence

At his trial, Petitioner called Jerry Palmer, *id.* at ¶¶ 29-31, and also testified in his own defense. *Id.* at ¶¶ 32-33. Palmer testified that he was at the Club, where he was having sex with a woman who was not his wife in the cab of a truck. *Id.* at ¶ 29. He testified that while he was in the cab, he saw Petitioner exit the club with three women and begin talking with two men. *Id.* He then saw Petitioner turn away from the discussion, and heard "a pop." *Id.* At that point, he saw somebody nicknamed "Fat Cat" holding a gun and heard two more pops. *Id.* He testified that Petitioner is not Fat Cat. *Id.* at ¶ 30.

The State called a detective to testify in order to impeach Palmer. *Id.* at ¶ 31. The detective testified that Palmer had told him that he both did not see the circumstances leading to the shooting and also did not know who fired the gun. *Id.* Although Palmer told the detective that he did not see who fired the gun, he told the detective that he assumed that it was Petitioner. *Id.*

Petitioner then testified. His testimony corroborated a number of the details provided by some of the State's witnesses. *Id.* at ¶¶ 32-33. He testified that there was an argument at the pool table inside the Club, and that some women were

15

thrown out as a result. *Id.* at ¶ 32. He said he left the Club with the women and entered the parking lot. *Id.* At that point, he said he walked to Marion Carr's vehicle in the lot. Jackie began kicking Carr's vehicle, after Williams exited it and went into the Club. Williams and McDonald exited the Club together, and Jackie began arguing with them. *Id.* Here, Petitioner says he approached Jackie, McDonald, and Williams in an attempt to diffuse the argument. *Id.* Williams told him to "leave it alone." *Id.* Petitioner testified that as a crowd began to gather, he walked away from the confrontation toward Carr's vehicle. *Id.* At that time, he said he heard shots, but did not see where they came from. *Id.* at ¶ 33. He said he ran from the parking lot, and walked to the apartment in which he was found. *Id.*

Petitioner now wishes to supplement this evidence by presenting evidence from two eyewitnesses – Tylon Rodgers and Darrin Thornton—who did not testify at his original trial.  This is the same evidence of actual innocence that Petitioner presented to the state court. *See id.* at ¶¶ 37, 39-43, 45.

Thornton is now deceased, and has not presented testimony for Petitioner. *See id.* at ¶ 45. However, Petitioner presented a notarized affidavit from Thornton, in which he averred that he was at the Club when the shootings took place. *Id.* at ¶ 37; (Ex. G to Resp.'s Mot. To Dismiss, Doc. 21-15, at 101).

In his affidavit, Thornton stated that he observed "some arguing taking place toward the middle of the parking lot area" after he had "walked out of the club" and was "standing by the entrance . . . talking with other people who were standing around." (Ex. G to Resp.'s Mot. To Dismiss, Doc. 21-15, at 101).  He averred that he recognized Jackie, who he said was "arguing with a man who I later discovered was

16

Jerome McDonald." (*Id*.). He also recognized Petitioner, who he said was standing next to Jackie. (*Id*.). He averred that he heard gunshots and "[t]hings happened really quickly." (*Id*.). He ducked down, but "had a clear view of Michael Carlos." (*Id*.). He observed that "Michael Carlos did not have a gun in his hands," and that "Michael Carlos began to run away from the gunshots as did everyone else." (*Id*.). He averred that, based on the view he had of Petitioner, he "would have been able to see if he had been the one doing the shooting," and said he knows that Carlos did not have a gun and did not do the shooting. (*Id*.). Thornton said he knows Petitioner through Petitioner's brother, Toby, and did not speak with the police immediately after the incident because he "was involved in [unfavorable activities] at the time of the shooting . . ." and "later served prison time" due to his involvement "in drug activity." (*Id*.).

Petitioner also filed an unnotarized affidavit from Tylon Rodgers (*id*. at 85-86). In it, Rodgers stated that he was "in the parking lot area" of the Club "listening to music and talking with friends," including Marion Carr. (*Id*. at 85). He observed to his left "a confrontation [that] had developed with some individuals," including "Jerome McDonald, Jackie Samuels, and a girl named Patricia." (*Id*.).Then, he "saw a crowd of people gathering around the commotion," including Petitioner, who "looked as though he was trying to stop whatever was going on." (*Id*.). He stated that at that point, "Terry Williams . . . had made his way into the small crowd . . . and look[ed] as if he had joined in on the arguing." (*Id*.). Rodgers testified that at that point, more people in the crowd had joined in on the argument, and he heard gunshots. (*Id*.). He "took cover on the ground between the cars," and saw that

17

"people were scattering and running everywhere." (*Id*.). He stated that he remembered "seeing Michael Carlos on the outside edge of the crowd," and that he remembered "without doubt that Michael Carlos did not have a gun in his hand and was not one of those in the crowd doing the shooting." (*Id*. at 86). He stated that he was out on bond for a drug case during Petitioner's trial, and "had no intentions of going back to court for [his] own drug case." (*Id*.). For that reason, he was not interested in "get[ting] involved in someone else's murder case." (*Id*.). Further, he did not "trust the police department enough to come forward" over the years, because he "was afraid that they would somehow find a way to charge [him] on some other drug activities" or that "the people responsible [for the murders] might come after [him]." (*Id*.).

Rodgers provided testimony during Petitioner's state post-conviction hearing. *Carlos*, 2013 IL App (4th) at ¶¶ 39-44. He testified that he and Petitioner were cousins. *Id*. at ¶ 39. He said he had known Petitioner since 1986, and they were members of the same gang at the time of the shooting. *Id*. at ¶ 42. He further testified that he spoke with Petitioner's brother, Toby Carlos, about "what to put in the affidavit," and that he received a typed affidavit in the mail from Toby Carlos, which he then signed. *Id*. at ¶ 43.

According to Rodgers testimony at the hearing, he was in the front passenger seat of a car that was parked at the Club when the shooting took place. *Id*. at ¶ 39. He was in the vehicle with three other people, including Marion Carr, and they were drinking. *Id*. He observed an argument brewing in the parking lot between McDonald, Williams, Pilant, and Jackie, and saw Petitioner standing with them. *Id*.

18

As Rodgers was about to open a bottle, he heard a pop. *Id.* He exited the car, and heard four more gunshots. *Id.* at ¶ 40. He testified that during this time, he did not see who fired the gun, but that he did not see Petitioner with the gun. Moreover, he saw Petitioner run from the scene between the first shot and the remaining shots. *Id.*

## C. Application of the Actual Innocence Exception to Petitioner's Case

*House* provides a good example of how the actual innocence gateway works, because the Supreme Court referred to it as a "close case." 547 U.S. at 554. In *House*, a man who had previously been convicted of murder brought a procedurally defaulted habeas claim by presenting evidence of actual innocence. The petitioner had been convicted of murder on the basis of "circumstantial" but "quite strong" evidence. *Id.* at 533 (internal quotation marks omitted). Specifically, he had been witnessed near the location where the body was found; he had scratches and bruises on his hands and arms that suggested he might have beaten the victim to death and hidden her body; he gave inconsistent testimony about his whereabouts at the time of the murder; lab testing revealed human blood on his pants that was consistent with the victim's blood; and semen found on the victim's nightgown and panties was consistent with the petitioner's. *Id.* at 520-29. In support of his claim of actual innocence, the petitioner submitted a number of pieces of newly discovered evidence. First, he produced scientific proof that the semen found on the victims nightgown and panties belonged to the victim's husband and not to him. *Id.* at 540. The state had relied on the evidence of semen to establish the petitioner's motive for murdering the victim: sexual assault. *Id.* at 540-41. Second, he produced evidence

strongly suggesting that the evidence of blood stains the state relied upon was very unreliable, and that it was likely that his pants were not stained with the victim's blood until *after* he turned the pants over to the police. *Id.* at 547. Third, he presented evidence that the victim's husband was the actual murderer. *Id.* at 548-53. Pertinent to this case, that evidence included testimony from two witnesses who heard the victim's husband confess to the crime. *Id.* at 549-50. The Court noted that these witnesses were reliable because they were "both lifelong acquaintances of [the victim's husband]," and there was no evidence as to why either "would have wanted either to frame him or help [the petitioner]." *Id.* at 551. The Court held that this combination of evidence of actual innocence met the high burden. *Id.* at 554. It "called into question" the "central forensic proof" tying the petitioner to the crime and also "put forward substantial evidence pointing to a different suspect." *Id.*

Petitioner argues that his case is similar to *House* because his new witnesses – Thornton and Rodgers – together call into serious doubt the only real evidence that the State presented against him: the testimony of eyewitnesses who saw him shoot the victims. He argues that the State's witnesses provided inconsistent recollections of what happened at the club, and for that reason are not credible. Moreover, he argues that Thornton and Rodgers both aver without reservation that he did not possess a gun. He believes that this conflict with the eyewitness testimony from trial is enough to unsettle all reasonable jurors in light of the inconsistencies of the eyewitness testimony at trial.

Petitioner must fight an uphill battle. New affidavits from eyewitnesses that simply contradict other eyewitnesses are poor vehicles for establishing actual

innocence. *See Smith v. McKee*, 598 F.3d 374, 388 (7th Cir. 2010); *Hayes v. Battaglia*, 403 F.3d 935, 937 (7th Cir. 2005). In *Hayes*, the Seventh Circuit summarized the type of evidence that can serve "[t]o demonstrate innocence so convincingly that no reasonable jury could convict," as including "documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." 403 F.3d at 938. In that case, a petitioner serving a life sentence for robbing a number of people and murdering one attempted to prove his innocence by presenting the testimony of six relatives "who would have testified that he had been home watching a basketball game when the crime was committed." *Id.* at 937. At trial, the state had presented six eyewitnesses who identified him as the perpetrator and had also identified him in an earlier lineup. *Id.*

The Court held that this evidence was insufficient to open the gateway, as "the likelihood that [the petitioner's] family was willing to commit perjury" was likely greater than the likelihood that the eyewitnesses each independently misidentified petitioner. *Id.* at 938. In *Smith*, the Seventh Circuit summarized the rule from *Hayes*, writing that "a six-versus-six split between exculpatory and inculpatory witnesses meant that the defendant did not meet the high threshold for an actual innocence claim." 598 F.3d at 388. The Court applied *Hayes*, and held that two new affidavits – one from an alibi witness who said the petitioner was at home studying at the time of the shooting, and another who said he saw the shooting and knew that the petitioner was not the shooter – were insufficient to "counter the

21

state's two eyewitness identifications and the evidence of [the petitioner's] self-inculpating statement [to police]." *Id.*

The new evidence submitted by Petitioner at most creates the sort of draw that is insufficient to demonstrate actual evidence. *See id.* The State presented two witnesses who testified that they witnessed Petitioner shoot Williams (Skinner and Kirchell Butler), one witness who testified that he witnessed Petitioner shoot McDonald (Thomas Ahlers), other witnesses who testified that they saw Petitioner shoot a gun or act as if he was shooting a gun (Jackie and Clyde Butcher), as well as a witness who testified that he did not see a gun but had made prior statements that Petitioner was the shooter (Marion Carr). *People v. Carlos*, 2013 IL App (4th) 110389-U at ¶¶ 6-26. Collectively, that is five witnesses who testified at trial that they saw Petitioner using a gun at the time of the murders and one witness who testified differently but was impeached.  Against those witnesses, Petitioner offers two affidavits suggesting that the contrary is true.

This evidence is not of the type that undermines key assumptions on which the jury relied, as the jury was aware of the inconsistencies in the eyewitnesses' testimony. *See House*, 547 U.S. at 554. In certain circumstances, unlike those here, new eyewitness testimony can, in fact, undermine key assumptions. For example, in *Jones v. McKee*, No. 08 CV 4429, 2010 WL 3522947 (N.D. Ill. Sept. 2, 2010), Judge Zagel held that a petitioner could pass through the actual innocence gateway on the basis of an eyewitness affidavit from a co-defendant claiming full responsibility for a murder. *Id.* at *8. As here, the new evidence contradicted the inconsistent testimony of other eyewitnesses. However, unlike here, the testimony of those eyewitnesses

was inconsistent with physical evidence with which the newly discovered affidavit was consistent. *See id.* Here, Petitioner has simply offered evidence that contradicts the eyewitnesses who testified. He has not provided evidence as to why this contradiction fatally undermines their testimony or calls that testimony's accuracy into question. *See House*, 547 U.S. at 554. Therefore, even if Petitioner matched the state witness-for-witness with new eyewitness, he would at most create a draw. *See Smith*, 598 F.3d at 388.

The various inconsistencies in the trial eyewitnesses' testimony do nothing to change this fact. Petitioner argues that his eyewitnesses help establish a consistent chain of events, and notes that the State's witnesses disagreed on a number of pertinent details. For example, some of the State's witnesses testified that the shooting happened in the heat of an argument, while other of the State's witnesses testified that Petitioner walked away and returned before shooting. Moreover, most of the State's witnesses testified that the parking lot was very crowded and loud, while Kirchell Butler testified that the parking lot was relatively empty and quiet. Petitioner seems to imply that these inconsistencies undermine the testimony of each of the eyewitnesses presented by the state. However, as the Illinois appellate court observed, the State presented "multiple witnesses who knew [Petitioner] and were standing in clear view of him at the time of the shooting" and "identified [Petitioner] as the shooter." *People v. Carlos*, 2013 IL App (4th) 110389-U at ¶ 67. The testimony of these eyewitnesses is not dependent upon each other. Even if the testimony of these eyewitnesses included certain factual discrepancies, "[t]he risk that [they] all made the same error is small." *See Hayes*, 403 F.3d at 938. Perhaps

even more importantly, Petitioner has not presented any evidence beyond the words of his new eyewitnesses that suggests their accounts are somehow more accurate than that of the trial witnesses.

Petitioner's new evidence suffers from an additional problem: his eyewitnesses are not cloaked with the type of credibility necessary to open the gateway. *See McQuiggin*, 133 S. Ct. at 1935 (instructing courts to consider "the timing of the submission and the likely credibility of [a petitioner's] affiants" in evaluating the reliability of evidence of actual innocence). In assessing reliability, identity matters. In *House*, the Supreme Court considered testimony from new witnesses who had "no evident motive to lie." 547 U.S. at 552. This stands in contrast to testimony "from inmates, suspects, or friends or relations of the accused." *Id.  See also Hayes*, 403 F.3d at 938 (describing reliable evidence for the purpose of the actual innocence exception as the testimony of "some non-relative" who could provide a corroborated alibi); *Jackson v. Ramos*, No. 08 CV 7413, 2010 WL 4363204, at *12 (N.D. Ill. Oct. 27, 2010) ("The affidavits of two co-defendants and family members are not the type of 'trustworthy eyewitness accounts' envisioned by *Schlup.* . . .").

Petitioner relies on *House*, and suggests that Rodgers and Thornton should be viewed as credible witnesses because they are similarly disinterested. However, neither Rodgers or Thornton are disinterested in the same way that the new witnesses in *House* were disinterested. *See* 547 U.S. at 552. Petitioner and Rodgers are related – they are cousins – and they are members of the same gang. Moreover, Rodgers and Petitioner were co-conspirators in a criminal drug conspiracy. *People v.*

*Carlos*, 2013 IL App (4th) 110389-U at ¶¶ 39,44. Because Petitioner and Rodgers are (1) related, (2) share a gang affiliation, and (3) were implicated in the same criminal conduct, Rodgers's testimony lacks the indicia of credibility that would make it reliable eyewitness testimony. *See House*, 547 U.S. at 552. Thornton similarly has a reliability problem. He stated in his affidavit that he knows Petitioner through Petitioner's brother; rather than being a reliable and disinterested eyewitness, he is a family friend who therefore has a motivation to lie.

Moreover, District Court may "consider how the timing of the submission . . . bear[s] on the probable reliability of that evidence." *House*, 547 U.S. at 538; *McQuiggin*, 133 S. Ct. at 1935 ("unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing."). Rodgers signed his un-notarized affidavit on October 27, 2008 (Ex. G, Doc. 21-15, at 86), and Thornton signed his on July 28, 2009 (*id*. at 101). Both affidavits were obtained over fifteen years after the evening of the murder, over thirteen years after Petitioner's conviction was final, and over ten years after Petitioner's time to file a habeas petition had expired. The witnesses' lateness is not unexplained: both said they were actively avoiding police because of outstanding drug charges and other trouble with law enforcement.

Rather than excusing the new eyewitnesses' lateness, these explanations provide further reason to doubt their credibility. Despite having had their evidence of Petitioner's actual innocence since the moment they witnessed the shooting, both actively avoided police. *See House*, 547 U.S. at 550-51 (explaining the delay may be excusable when previously unknown eyewitnesses attempted to approach the police,

25

and then came forward again upon learning that the petitioner's trial had been reopened). And, even if these eyewitnesses wished to avoid the police, they have not provided any reason that they would not have approached Petitioner or his family at that time. Furthermore, neither came forward independently once their trouble with the law was less immediate. Instead, it appears that they planned their statements with the help of Petitioner and his brother. *See People v. Carlos*, 2013 IL App (4th) 110389-U at ¶ 43. These factors further detract from the witnesses' credibility.

In conclusion, the Court finds that Petitioner has not met the high hurdle that he must to establish actual innocence. At trial, the State presented multiple witnesses who testified that they either saw Petitioner shoot the victims or saw Petitioner with a gun at the time of the shooting. Standing alone, the type of evidence that Petitioner has presented – affidavits from eyewitnesses who did not testify at trial who say Petitioner did not have a gun and did not do the shooting– is not the type that persuades the court that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329. This conclusion is buttressed by credibility problems presented by the new witnesses. These eyewitnesses are not the type of disinterested observers that can provide reliable testimony; instead they are family and friends of Petitioner who came forward over fifteen years following the shooting.   For this reason, the Court concludes that Petitioner cannot excuse the untimeliness of his petition.

### CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Under 28 U.S.C. § 2253(c)(1), a petitioner may only appeal from the court's judgment in his habeas case if he obtains a certificate of appealability. "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). A petitioner need not show that the appeal will succeed, but he must show "'something more than the absence of frivolity' or the existence of mere 'good faith'" on his part. *Miller-El v. Cockrell*, 537 U.S. 322, 337-38 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)). If the district court denies the request, a petitioner may request that a circuit judge issue the certificate. Fed. R. App. P. 22(b)(1).

Based on the record before it, the Court cannot find that reasonable jurists would debate that the Petition is untimely or debate that Petitioner cannot excuse his untimely filing. Accordingly, a certificate of appealability is denied.

CONCLUSION

For the foregoing reasons, Respondent's Motion to Dismiss (Doc. 21) is GRANTED. Petitioner's habeas corpus petition (Doc. 10) is DISMISSED AS UNTIMELY. The Court DECLINES to issue a certificate of appealability.

Entered this 24th day of August, 2015.


                                    s/Joe B. McDade
                                    JOE BILLY McDADE
                             United States Senior District Judge